COLEGIO DE INGENIEROS Y AGRIMENSORES DE PUERTO RICO, demandantes y recurridos, *v.* AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS DE PUERTO RICO, ETC., demandados y peticionarios.

*Números:* CE-87-85  CE-87-90   *Resueltos:* 21 de octubre de 1992

*Fernando Castro Maldonado* y *Arturo Trías*, de *Trías, Doral, Muñoz, Acevedo y Otero*, abogados de la peticionaria; *Jay A. García Gregory* y *Mario Arroyo Dávila*, de *Fiddler, González y Rodríguez*, abogados de la recurrente Metcalf & Eddy, Inc.; *Gilberto Oliver Vázquez*, de *Quilichini, Oliver Medina & Gorbea*, abogado de la recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

La controversia principal que se plantea en este caso es si el Colegio de Ingenieros y Agrimensores de Puerto Rico (en adelante el Colegio) tiene la legitimación activa para acudir a los tribunales cuando existan situaciones que impliquen la práctica ilegal de la ingeniería o la agrimensura por parte de personas no colegiadas a fin de que se cumplan las leyes relativas a la práctica de ambas profesiones.

I

*Los hechos*

El Colegio solicitó al Tribunal Superior que dictase sentencia declaratoria en contra de las codemandadas, aquí recurrentes, Autoridad de Acueductos y Alcantarillados (en adelante la Autoridad) y de Metcalf & Eddy, Inc. (en adelante Metcalf). El Colegio cuestionó la legalidad de ciertas cláusulas de un contrato de servicios profesionales celebrado entre la Autoridad y Metcalf, porque, alegadamente, reservaba a Metcalf ciertas funciones que constituían práctica de la ingeniería. Por tratarse Metcalf de una corporación, y siendo que las corporaciones no pueden ejercer la ingeniería en Puerto Rico, el Colegio alegó que dichas cláusulas contravenían las leyes que regulan la práctica de tal profesión.

En consecuencia, el Colegio pidió al tribunal, primero, que se declarasen nulas e ineficaces todas aquellas cláusulas del contrato en las cuales se concede facultad a Metcalf para preparar especificaciones de diseño, construcción y ejecución, interpretar planos de construcción y especificaciones, revisar y evaluar el trabajo de diseño e ingeniería en progreso, revisar y aprobar dibujos de taller y supervisar los trabajos de construcción para asegurar su ejecución conforme a planos y especificaciones. En segundo lugar,

reclamó que el tribunal declarase nulas e ineficaces todas aquellas cláusulas que conceden a Metcalf funciones de gerencia de construcción y diseño, previa determinación del foro de instancia en el sentido de que la Gerencia de Construcción constituye práctica de la ingeniería. En tercer lugar, el Colegio solicitó que se declarase que constituye práctica ilegal de la ingeniería tanto el uso por parte de metcalf del título de ingeniero en conjunto a su nombre corporativo así como también sus representaciones como ingeniero ante la prensa y el público puertorriqueño. El Colegio sometió como apéndices a la demanda la copia del contrato entre la Autoridad y Metcalf, y la copia del Convenio Suplementario suscrito por éstas con posterioridad al contrato original.

Las codemandadas presentaron, por separado, sendas mociones de sentencia sumaria para que se desestimase la demanda del Colegio. Ambas aceptaron haber suscrito un contrato de servicios profesionales. Metcalf señaló que el Tribunal Federal de Distrito para el Distrito de Puerto Rico había emitido una orden en contra de la Autoridad a fin de que ésta cumpliese con las disposiciones del *Clean Water Act* en cuanto a la reparación, rehabilitación, mejoras y mantenimiento de sus plantas de tratamiento de aguas usadas. 33 U.S.C. sec. 1251 *et seq.* Debido a que la Autoridad se encontraba en violación de dicha orden, contrató a Metcalf, corporación con amplia experiencia en asuntos de reglamentación ambiental y exigencias de la Environmental Protection Agency (E.P.A.), para que le ayudase a cumplir con lo ordenado por el Tribunal federal. Metcalf es una corporación organizada conforme a las leyes del estado de Delaware y autorizada a hacer negocios en Puerto Rico.

El Contrato original entre la Autoridad y Metcalf (identificada como M&E), en sus partes pertinentes, dispone como sigue:

## II. SCOPE OF SERVICES

2. *Program Office.* M&E shall establish a program office in Puerto Rico. The program office shall be staffed *to provide day-to-day management of the planning, design, procurement, and construction*, operations, maintenance and operator training. M&E shall be responsible for adminsitration [sic] and supervision of all design, procurement and construction contracts on behalf of the Authority. *M&E shall assign a staff of sufficient size and technical capability to administer the contracts, review and evaluate progress, and maintain specified standards of quality through a quality assurance inspection and testing program. The staff shall interpret contract drawings and specifications, review and approve shop drawings, conduct regularly scheduled* review meetings with contractors, vendors and equipment suppliers. The staff shall approve samples, and order such testing as may be necessary. M&E shall review and evaluate change order requests and review the results with the Authority.

c. *Design Services.* In connection with the repair and rehabilitation of the treatment facilities contained in the Order (the "Facilities"), M&E shall provide the following services:

1. *Design Management.* M&E shall prepare, design, construction and performance specifications for the design, equipment procurement, construction and operation of each of the facilities as applicable. ...

2. *Procurement of Design Services.* Where determined by M&E and the Authority that it would be cost effective and consistent with the schedule to utilize local A–E design firms, M&E, working with the Authority, shall pre-qualify local firms, solicit proposals from these firms, review and evaluate all proposals it receives and assist the Authority to award contracts on a competitive basis. *M&E will manage the contracts to ensure technical adequacy, constructibility, timely completion, quality control and cost control.*

e. *Construction Services.* In connection with the repair and rehabilitation of treatment plants in the Order, M&E shall provide the following services:

3. *Management. M&E shall manage the construction contracts, review and evaluate work progress, and maintain specified standards of quality through a quality assurance, inspec-*

*tion and testing program.* M&E's responsibilities in connection with the construction contracts shall include the following:

    – develop and maintain a Master Program Schedule for all major elements of the construction work.

    – *review and approve shop drawings, samples, diagrams and illustrations.*

    – review payment requests and make recommendations for payments to the construction contractors.

    – *review and evaluate change order requests.*

    – *monitor the work of all construction contractors to determine that it is being performed in accordance with construction specifications.* Materials testing shall be performed by qualified testing personnel.

    .    .    .    .    .    .    .

    – *guard against defects and deficiencies in the work, and reject any work that does not conform to construction specifications. If M&E suspects that any contractor is providing work not in accordance with construction specifications, M&E shall require that such contractor stop such work until special inspections and testing are completed.*

    – to guard against defects and deficiencies, M&E shall establish a Quality Assurance Plan which shall outline testing, review and inspection procedures, and which specifies remedies to be employed when a construction contractor's performance is not in compliance with construction specifications. (Énfasis suplido.)

    En sus respectivas mociones de sentencia sumaria, la Autoridad y Metcalf afirmaron que, con el propósito de aclarar aquellas cláusulas del Contrato original impugnadas públicamente por el Colegio, tres (3) meses después del referido contrato suscribieron un Convenio Suplementario. En este convenio se estipulaba que Metcalf contrataría a ingenieros debidamente licenciados para que fuesen estos quienes efectuasen todos los servicios de ingeniería que Metcalf se había comprometido a realizar en el contrato original.[1]

---

[1] El Convenio Suplementario tuvo el propósito de aclarar el contrato original entre la Autoridad de Acueductos y Alcantarillados (en adelante Autoridad) y Metcalf & Eddy, Inc. (en adelante Metcalf); su texto enmendó el párrafo V, *Miscellaneous matters*, pág. 16 del Contrato. La cláusula V.b. original dispone como sigue:

Cada Moción de Sentencia Sumaria estaba acompañada de copias del Contrato original, del Convenio Suplementario (*Supplemental Agreement*) así como del Acuerdo (*Agreement*) suscrito a los cuatro (4) días después de firmado el Convenio Suplementario. El Acuerdo se celebró entre Metcalf y la sociedad profesional de ingenieros Gayá and Associates, que luego vino a ser Gayá, Dedyo y Asociados (en adelante Gayá).(²) En el Acuerdo, Gayá se comprometió a realizar aquella labor de ingeniería que le fuese requerida por Metcalf de conformidad con el contrato original entre ésta y la Autoridad.(³) Los codemandados argumentaron que la controversia se había tornado académica por cuanto todos los servicios de ingeniería estaban a cargo de colegiados debidamente autorizados a ejercer la profesión y ya no estaban a cargo de la corporación Metcalf.

El foro de instancia, luego de considerar ambas solicitu-

---

"M & E shall conduct its business in strict compliance with all laws, ordinances, regulations and requirements of applicable Federal, state or local authorities."

A raíz del Convenio Suplementario, el texto de la referida cláusula se modificó así:

"To the extent that any of the services described in Paragraph II entitled, Scope of Services, may involve the practice of engineering or architecture as defined in Article 1(e)(1)(2) of Act No. 399 of May 10, 1951, as amended, 20 L.P.R.A. sec. 682, M&E shall engage and/or contract the services of duly qualified and licensed Engineers and/or of professional civil partnerships constituted or comprised of duly qualified and licensed Engineers and/or Architects, in accordance with the provisions of said Act No. 399."

(²) Gayá, Dedyo y Asociados es una sociedad profesional compuesta por los ingenieros Raúl Gayá Benejam, Raúl Gayá Nigaglioni y John Dedyo, todos debidamente colegiados y licenciados para ejercer la ingeniería en Puerto Rico.

(³) El breve Acuerdo entre Metcalf y Gayá hace referencia al Contrato de servicios profesionales entre Metcalf y la Autoridad. En este Acuerdo también se cita el Convenio Suplementario mediante el cual Metcalf se obligó a contratar ingenieros licenciados para cualquier servicio que implicase práctica de la ingeniería. La primera de las seis (6) cláusulas que pactaron Gayá y Metcalf en el Acuerdo dispone lo siguiente:

"1. Gaya [sic] shall perform such engineering work, including design services, as may be required by M&E pursuant to the above mentioned Agreement between M&E and the Authority including but not limited to the design services described in Part II (Scope of Services), subparagraph c (Design Services) of the Agreement between M&E and the Authority and/or any other service constituting the practice of engineering as defined in subdivision (e) of Article 1 of Act No. 399 of May 10, 1951, as amended, 20 L.P.R.A. sec. 682."

des de sentencia sumaria y la moción de oposición de la parte demandante, declaró sin lugar las mociones de los codemandados.

Tanto la Autoridad como Metcalf acuden ante nos mediante Petición de *certiorari* para que revoquemos la resolución emitida por el ilustrado tribunal de instancia y se desestime la demanda incoada por el Colegio. Como fundamento a su pedido, Metcalf expone que el Colegio carece de legitimación activa para entablar la demanda. Alega que, en todo caso, le corresponde al Secretario de Justicia acudir a los tribunales en los casos de práctica ilegal de la. ingeniería. También solicita que en vez de declararse nulas las cláusulas del contrato entre la Autoridad y Metcalf, el Tribunal juzgue la *forma* de *operar* utilizada por la corporación en lugar de la *forma corporativa* que se utiliza en el contrato.[4]

Por su parte, la Autoridad manifiesta que el Contrato original contiene una cláusula sobre "materias misceláneas" en la cual Metcalf se compromete a cumplir con todas las leyes, los reglamentos y las ordenanzas aplicables. Según la Autoridad, la inclusión de dicha cláusula en el contrato impide interpretar que las cláusulas impugnadas por el Colegio sean violatorias de la ley, la moral o el orden público.[5] Afirma que la intención de las partes fue acatar todas las leyes y los reglamentos e invoca el articulado del Código Civil concerniente a la interpretación de los contratos. La Autoridad repite el argumento utilizado por Metcalf, según el cual "las formalidades en los contratos no son elemento determinante de la ilegalidad de la práctica de la ingeniería"; sostiene que la ilegalidad surge exclusivamente de la "prestación" de servicios y de la "práctica

---

[4] Hágase referencia a la Moción Complementaria a Petición de *certiorari* sometido por Metcalf a este Tribunal, págs. 3–5.

[5] Véase el texto de la referida cláusula en el esc. 1.

ilegal" de dicha profesión por parte de personas que no están debidamente autorizadas.

Este Tribunal consolidó ambas peticiones de *certiorari* y ordenó que se paralizaran los procedimientos en instancia.[6] Habiendo comparecido las partes recurrentes así como la demandante recurrida, estamos en posición de resolver.

## II

*Legitimación Activa del Colegio*

### A. *Ejercicio de la profesión de ingeniero*

■ Consideraremos, primeramente, los estatutos relacionados con la práctica de la profesión de ingeniero. La práctica de la ingeniería está regulada por la Ley Núm. 173 de 12 de agosto de 1988, que crea la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores de Puerto Rico (en adelante la Junta), 20 L.P.R.A. secs. 711–711z.[7]

Esta ley derogó la ley que estuvo vigente por treintisiete (37) años, la Ley Núm. 399 de 10 de mayo de 1951. Es la Junta la encargada de cumplir y hacer cumplir la Ley Núm. 173.[8]

Durante casi tres (3) décadas del siglo XX, la ingeniería pudo practicarse libremente en Puerto Rico sin necesidad de exámenes, licencias ni matrículas. A pesar de que durante el gobierno de España se regulaba la ingeniería en la Isla, al igual que se reglamentaba el ejercicio de otras pro-

---

[6] Con posterioridad a la presentación de los alegatos de las partes ante este Tribunal, la Autoridad sometió Moción de Desistimiento, a la cual se opuso Metcalf. Mediante Resolución, denegamos dicha solicitud.

[7] La referida Junta Examinadora fue creada por primera vez en este siglo en 1927, mediante la Ley Núm. 31 de 26 de abril de 1927.

[8] La Ley Núm. 399 de 10 de mayo de 1951 (20 L.P.R.A. ants. secs. 681 *et seq.*) era la ley vigente al momento de los hechos que dieron lugar a esta controversia entre el Colegio y los recurrentes.

fesiones tales como la medicina y la farmacia, el gobierno militar norteamericano suprimió las restricciones impuestas al ejercicio de aquélla. Véase Orden General Núm. 24 de 15 de febrero de 1900, puesta en vigor bajo el mando del Gobernador Militar George W. Davis. Con la aprobación de la Ley Núm. 31 de 26 de abril de 1927, se reguló nuevamente la profesión de ingeniero, esta vez limitándola a las personas que tuviesen el correspondiente título académico o que hubiesen ejercido por tres (3) años o más con anterioridad a la aprobación de la ley.[9]

Desde 1927, han sido tres (3) las leyes que han regido la práctica de la ingeniería: la Ley Núm. 31 (vigente desde 1927 hasta 1951), la Ley Núm. 399 (desde 1951 hasta 1988) y la Ley Núm. 173 (desde 1988 hasta el presente). La Ley Núm. 31, precursora de las Leyes Núms. 399 y 173, creó por primera vez la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores de Puerto Rico.[10] Esta ley fue derogada por la Legislatura en 1951, pero se mantuvo la existencia de la Junta. La Ley Núm. 399 de 10 de mayo de 1951 (20 L.P.R.A. ants. secs. 681 *et seq.*), aunque también ya ha sido derogada, era la ley vigente en el momento cuando surge la controversia entre el Colegio y los peticionarios y, por tanto, es la ley que aplica a estos hechos.[11] Pasemos, pues, a examinar las disposiciones de

---

[9] La Ley Núm. 31 estaba fundamentada en el Proyecto de la Cámara Núm. 8 presentado por el representante del Distrito de Vieques, señor Germán Rieckehoff, padre. Véase *Actas de la Cámara de Representantes*, 11ma Asamblea Legislativa, 2da Legislatura Ordinaria, San Juan, Negociado de Materiales, Imprenta y Transporte, 1928, pág. 7; *Sanquírico v. De la Cruz*, 40 D.P.R. 202, 204–205 (1929).

[10] Desde sus inicios, la Junta ha enfrentado varias demandas por parte de personas a quienes la Junta les negó la admisión a la ingeniería. Los siguientes casos sirven como ejemplo de ello: *Flores v. Junta Exam. de Ingenieros, Etc.*, 40 D.P.R. 592 (1930); *Mateo v. Junta Exam. de Ingenieros, Etc.*, 40 D.P.R. 594 (1930); *Isern v. Junta Examinadora de Ingenieros*, 45 D.P.R. 582 (1933).

[11] La Ley Núm. 399, *supra*, fue derogada por la Ley Núm. 173 de 12 de agosto de 1988 (20 L.P.R.A. secs. 711–711z). La Ley Núm. 173 no dispone que tendrá efecto retroactivo, por lo cual rige el Art. 3 del Código Civil:

la Ley Núm. 399, *supra*, pertinentes a la situación de hechos ante nos.

■ Bajo la citada Ley Núm. 399 era "ilegal para cualquier persona el practicar u ofrecer practicar en Puerto Rico la ingeniería, arquitectura o agrimensura, o usar, en relación con su nombre, o de alguna otra manera asumir, usar o anunciar, cualquier título o descripción que pueda producir la impresión de que es un ingeniero, arquitecto o agrimensor autorizado, a menos que esté matriculado como tal ..., que la correspondiente certificación se le haya expedido, y que sea miembro de dichos Colegios de Ingenieros y Agrimensores y de Arquitectos de Puerto Rico." 20 L.P.R.A. ant. sec. 681. Esta prohibición se mantiene vigente a través del Art. 25 de la Ley Núm. 173 que regula actualmente la profesión, 20 L.P.R.A. sec. 711x.

Se definía allí "practica de la ingeniería o arquitectura" como:

(1) La prestación de cualquier servicio profesional o la ejecución de cualquier trabajo de naturaleza creadora para cuya realización se requieran los conocimientos, adiestramientos y experiencias de un ingeniero o arquitecto.

(2) La aplicación de los mencionados conocimientos especiales de las ciencias físicas, matemáticas y de la ingeniería o arquitectura, al prestarse tales servicios profesionales o al ejecutarse tales trabajos de naturaleza creadora como se requieren en cualquier realización de asesoramientos, estudios, investigaciones, valoraciones, trazados de planos, mediciones, proyectos, inspecciones y superintendencia de obras en construcción a los fines de afianzar la observancia de sus especificaciones y la realización adecuada de lo proyectado, en relación con cualesquiera obras públicas o privadas, instalaciones, maquinarias, procedimientos y métodos industriales, equipo, sistemas y trabajos de carácter técnico o arquitectónico.

---

"Las leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario.

"En ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior." 31 L.P.R.A. sec. 3. Véase *Luce & Co., v. Junta Salario Mínimo*, 62 D.P.R. 452, 470 (1943).

*Se entenderá que una persona practica u ofrece practicar la ingeniería* o la arquitectura si se hallare en el ejercicio de esta última o en la de cualquier ramo de la primera; o *si, mediante el uso de palabras escritas* u orales, rótulos, símbolos, dibujos o señales de cualesquiera clases, o por cualquier otro medio físico, *se anunciare como ingeniero* o arquitecto. (Énfasis suplido.) 20 L.P.R.A. ant. sec. 682(e).

Esta definición se mantuvo sustancialmente en la ley que está vigente en la actualidad.([12]) 20 L.P.R.A. sec. 711x y 711b.

■ Con respecto a los ingenieros de renombre, así como a los licenciados por autoridad competente en cualquier estado, territorio o posesión de Estados Unidos, o de cualquier país, la Ley Núm. 399, *supra,* le permitía a la Junta autorizarlos para ejercer la profesión en Puerto Rico bajo

---

([12]) "A los efectos de las secs. 711 a 711z de este título se entenderá que una persona practica las profesiones reglamentadas por las mismas cuando ejerza u ofrezca ejercer las profesiones de ingeniería, agrimensura o arquitectura o incluyendo la enseñanza de las mismas, o desempeñe cargos o puestos, en el Gobierno del Estado Libre Asociado de Puerto Rico o en la empresa privada, que conlleven la realización de funciones o clasificaciones definidas en las secs. 711 a 711z de este título como práctica; o que mediante el uso de palabras escritas u orales, rótulos, símbolos, tarjetas, impresos de correspondencia, dibujos o anuncios de cualquier clase o por cualquier otro medio físico o electrónico, se anuncie o dé la impresión de ser un ingeniero, arquitecto o agrimensor o que en alguna otra forma o manera use cualquiera de estos tres (3) vocablos profesionales en relación con su nombre o persona.

"Será ilegal, para cualquier persona, el practicar u ofrecer practicar en Puerto Rico la ingeniería, arquitectura o agrimensura, o usar o anunciar en relación con su nombre, cualquier título, palabra o vocablo o descripción que pueda producir la impresión de que es un ingeniero, arquitecto o agrimensor autorizado, a menos que esté registrado como tal de acuerdo con las disposiciones de las secs. 711 a 711z de este título, que posea la correspondiente licencia o certificado y que sea miembro activo del Colegio de Ingenieros y Agrimensores de Puerto Rico o del Colegio de Arquitectos de Puerto Rico, según fuere el caso.

"Será igualmente ilegal para cualquier persona natural o jurídica, en adición a lo antes dispuesto y lo dispuesto en otras leyes, emplear, o en alguna forma, por sí o por medio de agentes, representantes o solicitadores de empleo, gestionar o patrocinar el empleo o servicios de otras personas para la práctica de las profesiones aquí reglamentadas, a menos que éstas estén debidamente autorizadas bajo las secs. 711 a 177z de este título y las leyes de colegiación aplicables para ejercer tales profesiones. Esta disposición será de aplicabilidad tanto al principal como al agente, representante y solicitadores de empleo. En todo anuncio, circular, aviso, carta o edicto que se fije o circule públicamente en el cual se soliciten los servicios de estos profesionales, se deberán expresar claramente los requisitos de certificado o licencia y colegiación." 20 L.P.R.A. sec. 711x.

ciertas circunstancias y limitaciones, conforme a la ley y al Reglamento.([13]) Son ingenieros de renombre aquellos que tienen renombre internacional por sus ejecutorias en el campo de la ingeniería.

B. *El Colegio de Ingenieros y Agrimensores de Puerto Rico*

Once (11) años después de haberse reglamentado la práctica de la profesión, la Legislatura aprobó la Ley Núm. 319 de 15 de mayo de 1938 (20 L.P.R.A. secs. 731–743) para crear el Colegio de Ingenieros de Puerto Rico. Durante tres (3) lustros el Colegio mantuvo ese nombre, el cual más tarde fue cambiado a Colegio de Ingenieros, Arquitectos y Agrimensores.([14]) En 1978 los arquitectos se separaron de dicha corporación cuasi pública a fin de formar el Colegio de Arquitectos.([15]) A raíz de este desmembramiento, el nombre del Colegio refleja sólo las dos (2) profesiones que agrupa en la actualidad.

Bajo el nombre de Colegio de Ingenieros y Agrimensores de Puerto Rico se constituyó a los profesionales con derecho a ejercer la ingeniería o la agrimensura en el Estado Libre Asociado de Puerto Rico en una entidad jurídica o corporación cuasi pública. 20 L.P.R.A. sec. 731. El Colegio tiene facultad, entre otras, para demandar y ser demandado, como persona jurídica. 20 L.P.R.A. sec. 732. Esta disposición se ha mantenido inalterada desde que se aprobó la citada Ley Núm. 319 en 1938.

La ley habilitadora del Colegio enumera los deberes y las obligaciones de esta entidad jurídica tales como contribuir al adelanto de la ingeniería y la agrimensura en Puerto Rico, determinar medidas de protección mutua, y

---

([13]) Véase la Ley Núm. 399, *supra*, 20 L.P.R.A. ants. secs. 703 y 704. La nueva ley tiene disposiciones similares, Ley Núm. 173 de 12 de agosto de 1988 (20 L.P.R.A. secs. 711t y 711v).

([14]) Ley Núm. 27 de 13 de mayo de 1954.

([15]) Ley Núm. 96 de 6 de julio de 1978.

coadyuvar a una legislación razonable y justa especialmente en cuanto tenga ella relación con la profesión del ingeniero. Su Asamblea Anual y, en segundo término, su Junta de Gobierno rigen los destinos del Colegio. Los oficiales del Colegio son, a su vez, los oficiales de la Junta de Gobierno, debidamente elegidos. Véase 20 L.P.R.A. secs. 735–736 y 743.

C. *Facultad del Colegio para acudir ante los tribunales cuando se trate de práctica ilegal de la ingeniería*

En su señalamiento de errores, Metcalf plantea, como primer error, el siguiente:

ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL NO DESESTIMAR ESTA ACCIÓN CUANDO EL COLEGIO DE INGENIEROS Y AGRIMENSORES CARECE DE CAPACIDAD. JURÍDICA [LEGITIMACIÓN ACTIVA] PARA RADICAR ESTA ACCIÓN DECLARATORIA.

▮▮ ·Para ejercer la profesión de ingeniero en Puerto Rico bajo la derogada Ley Núm. 399, *supra,* se especificaban cuatro (4) requisitos: era necesario que la persona presentase evidencia de tener la preparación requerida; estar inscrita en un registro oficial; haber recibido la correspondiente autorización de la Junta Examinadora y, por último, ser miembro del Colegio. 20 L.P.R.A. sec. 681. La ley vigente, Ley Núm. 173, *supra,* tiene una disposición que recoge idénticos propósitos. 20 L.P.R.A. sec. 711.

Desde su constitución en 1938, aun cuando podía demandar y ser demandado, el Colegio carecía de autoridad en su ley habilitadora para acudir ante los tribunales del país a fin de que se les prohibiese practicar la ingeniería a los no colegiados. En 1980 se enmendó la Ley Núm. 319, *supra,* que crea el Colegio "para proveer los mecanismos necesarios que permitan un mejor funcionamiento de la institución y para que pueda en esa forma descargar mejor

su responsabilidad pública".([16]) Entre las nuevas facultades concedidas al Colegio por la enmendadora Ley Núm. 12 de 29 de septiembre de 1980, está la siguiente:

El Colegio de Ingenieros y Agrimensores de Puerto Rico tendrá facultad:

. . . . . . . . .

(k) para recibir e investigar las *quejas* que se formulen respecto a situaciones que puedan resultar en la *práctica ilegal* de las profesiones, de las violaciones relacionadas con éstas, *y de existir evidencia a tales efectos, si se tratare de personas no colegiadas, proceder ante las autoridades competentes* a los fines de que se cumplan las leyes relativas a la práctica de las profesiones. (Énfasis suplido.) 20 L.P.R.A. secs. 732 y 732(k).

Así, pues, la Legislatura le concedió al Colegio no sólo la facultad de recibir e investigar las quejas sobre la práctica ilegal de la ingeniería y la agrimensura sino que, además, facultó al Colegio para acudir ante las autoridades competentes para que se hagan cumplir las leyes que regulan la práctica de ambas profesiones cuando exista evidencia en contra de personas no colegiadas que ejerzan ilegalmente.([17])

A fin de poder decidir si el Colegio tiene capacidad para instar demanda en los tribunales contra la peticionaria, es necesario que aclaremos el término "autoridades competentes" utilizado en la sec. 732(k) de la Ley Núm. 319, *supra.* La peticionaria Metcalf alega que "autoridades competentes" se refiere exclusivamente al Secretario de Justicia, mientras que la parte recurrida afirma que se refiere a los tribunales.

Cuando las expresiones de una ley son dudo-

---

([16]) Exposición de Motivos de la Ley Núm. 12 de 29 de septiembre de 1980, Leyes de Puerto Rico, pág. 1025.

([17]) El Colegio también está facultado para recibir e investigar quejas que se formulen con respecto a la conducta de los miembros en el ejercicio de la profesión. Este inciso no limita o altera la facultad de la Junta Examinadora para iniciar estos procedimientos por cuenta propia. 20 L.P.R.A. sec. 732(h).

sas, el medio más eficaz y universal para descubrir el verdadero sentido de la ley "es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla". Art. 19 del Código Civil, 31 L.P.R.A. sec. 19. "[L]a interpretación de una disposición específica de una ley requiere que consideremos el estatuto en su totalidad como 'parte de un todo coherente y armónico —el ordenamiento jurídico ...'. G. García Valdecasas, *Parte general del Derecho Civil Español*, Madrid, Ed. Civitas, 1983, pág. 111." *Zambrana Maldonado v. E.L.A.*, 129 D.P.R. 740, 749 (1992). Este Tribunal tiene la obligación de armonizar, hasta donde sea posible, todas las disposiciones de ley con miras a lograr un resultado sensato, lógico y razonable que represente la intención del legislador. Las leyes hay que interpretarlas y aplicarlas en comunión con el propósito social que las inspira, sin desvincularlas de la realidad y del problema humano que persiguen resolver. *Pueblo v. Pizarro Solís*, 129 D.P.R. 911 (1992); *Andino v. Fajardo Sugar Co.*, 82 D.P.R. 85, 94 (1961).

El significado de la frase "autoridades competentes" queda aclarado por el historial legislativo de la Ley Núm. 12, *supra*. La Comisión de Gobierno, presidida por el representante Edison Misla Aldarondo, sometió a la Cámara de Representantes el Informe de 19 agosto de 1980 que versa sobre el Proyecto de la Cámara 1413.([18]) En este Informe se explica lo siguiente:

Los incisos (k), (l), (m) y (n) son de *nueva creación*. El inciso (k) pretende cubrir una situación corriente que comprende *no-colegiados*, contra los cuales no podemos proceder administrativamente. *Tendríamos que acudir a los tribunales,*

---

([18]) Este conjunto de enmiendas, aprobadas en 1980, a la ley creadora del Colegio de Ingenieros tuvo varios propósitos: primero, atemperar la ley a los cambios ocurridos a raíz de la aprobación de la ley que separó la arquitectura de la matrícula del Colegio (*e.g.*, no se había eliminado la palabra "Arquitectos" del nombre del Colegio). En segundo lugar, cuando se aprobó en 1938 la ley habilitadora del Colegio estaba vigente la ley precursora de la Junta Examinadora, que data de 1927, por lo que era necesario enmendar la ley del Colegio para que estuviese acorde con la Ley Núm. 399 de 10 mayo de 1951, *supra*, que crea la Junta Examinadora.

*algo que no se provee en la ley actual. Se trata de la práctica
ilegal de las profesiones.* (Énfasis suplido.)([19])

Del historial legislativo de la Ley Núm. 12, *supra*, se
desprende que el inciso (k), 20 L.P.R.A. sec. 732(K), provee
una facultad nueva al Colegio, la cual no estaba contem-
plada en la Ley Núm. 319, *supra*, que creó el Colegio, es
decir, la de acudir a los tribunales para proceder contra los
no colegiados a quienes el Colegio no puede alcanzar
administrativamente. La frase "proceder ante las autorida-
des competentes" en el contexto de la Ley Núm. 319 de 15
mayo de 1938, *supra*, y de su historial legisativo significa
que, en la esfera civil, el Colegio podrá acudir ante los tri-
bunales por sí solo o, si lo prefiere, a través del Secretario
de Justicia para que se hagan cumplir las leyes cuando
exista evidencia contra personas no colegiadas envueltas
en situaciones que puedan resultar en práctica ilegal de la
ingeniería o la agrimensura.

La codemandada, aquí peticionaria, Metcalf alega que
es al Secretario de Justicia a quien únicamente corres-
ponde tramitar ante los tribunales los procedimientos re-
lacionados con la práctica ilegal de la profesión y fiscalizar
las leyes atinentes a la ingeniería. Aún más, nos solicita
que interpretemos que la frase "autoridades competentes"
en la Sec. 732(k) de la Ley Núm. 319, *supra*, se refiere al
Secretario de Justicia. No le asiste la razón.

Metcalf fundamenta su alegación en el inciso (f) de la
Sec. 743 de la ley que crea al Colegio:

El Colegio de Ingenieros y Agrimensores tendrá como deberes
y obligaciones las siguientes:

.        .        .        .        .        .

(f) Cumplir con todas las disposiciones de este Capítulo y
leyes relacionadas con el propósito de referir al Secretario de
Justicia para que éste lleve a cabo la acción pertinente, todo

---

([19]) Informe de la Cámara de Representantes sobre el P. de la C. 1413 de 19 de
agosto de 1980, 8va Asamblea Legislativa, 3ra Sesión Ordinaria, pág. 3, para enmen-
dar la Ley Núm. 319 de 15 de mayo de 1938, *supra*.

acto que conlleve la práctica ilegal de las profesiones. 20 L.P.R.A. sec. 743(f).

Esta sección no puede verse separadamente de la sección que la antecede, la Sec. 742 de la Ley Núm. 319 (20 L.P.R.A. sec. 742), la cual impone penalidades de multa o cárcel, o ambas penas, a las personas que practiquen ilegalmente la ingeniería o la agrimensura.[20] En 1980, a esta sección se le añadió un segundo párrafo:

> El Secretario de Justicia, por iniciativa propia, o a solicitud del Colegio, podrá entablar y tramitar ante los tribunales competentes, procedimientos y acciones correspondientes contra aquellas personas que así practiquen ilegalmente. 20 L.P.R.A. sec. 742.

Este segundo párrafo fue añadido a la Sec. 12 de la Ley Núm. 319, *supra*, 20 L.P.R.A. sec. 742, que crea el Colegio mediante enmienda efectuada por la Ley Núm. 12, *supra*. En el Informe de la Comisión de Gobierno de la Cámara de Representantes, *supra*, pág. 5, se aclara a qué se refiere esta adición al texto original:

> En la Sección 12 se establece que será el Secretario de Justicia, por iniciativa propia o a solicitud del Colegio el que entable y tramite ante los tribunales los *casos* contra aquellas personas que practiquen ilegalmente la profesión. (Énfasis suplido.)

Debido a que el primer párrafo de la Sec. 742, *supra*, trata sobre las penalidades que conlleva cometer el delito menos grave de práctica ilegal de la ingeniería o

---

[20] "Toda persona que sin ser debidamente admitida y licenciada para el ejercicio de la profesión según se dispone por este Capítulo o que durante la suspensión de su licencia practique como persona capacitada y autorizada para ello, se anuncie como tal o trate de hacerse pasar como ingeniero o agrimensor en ejercicio será culpable de delito menos grave, y convicta que fuere, se le impondrá multa no menor de cien (100) dólares ni mayor de trescientos (300) dólares, o cárcel por un período no menor de dos (2) meses ni mayor de seis (6) meses o ambas penas.

"El Secretario de Justicia, por iniciativa propia, o a solicitud del Colegio, podrá entablar y tramitar ante los tribunales competentes, procedimientos y acciones correspondientes contra aquellas personas que así practiquen ilegalmente." 20 L.P.R.A. sec. 742.

agrimensura, visto este segundo párrafo en su contexto, concluimos que la palabra "casos" en el historial legislativo se refiere a casos criminales. En el ámbito penal, el Colegio referirá al Secretario de Justicia los procedimientos y las acciones correspondientes contra aquellas personas que ilegalmente practiquen la ingeniería. El Colegio no tiene autoridad de ley para acusar criminalmente a los que cometen el delito de practicar ilegalmente.

En el área de lo civil, sin embargo, debe destacarse que la propia ley faculta al Colegio para presentar las acciones que estime pertinentes ante los tribunales contra no colegiados que ejerzan ilegalmente, con el propósito de que se cumplan las leyes relacionadas con la práctica de ambas profesiones. Es necesario interpretar de manera armoniosa la Ley Núm. 319, habilitadora del Colegio. *Zambrana Maldonado v. E.L.A.*, supra; *Pueblo v. Pizarro Solís*, supra; *García Pagán v. Shiley Caribbean, etc.*, 122 D.P.R. 193 (1988). El propio legislador, mediante la enmienda de 1980, hizo la distinción entre la *facultad* del Colegio para promover acciones civiles ante los tribunales cuando exista evidencia del ejercicio ilegal de la profesión —ya sean acciones directas a nombre del Colegio o bien a través del Secretario de Justicia— y el *deber* del Colegio de referir todo acto que conlleve práctica ilegal al Secretario de Justicia para que también se celebre el consiguiente procedimiento penal.

El inciso (k) de la Sec. 732, al igual que el segundo párrafo de la Sec. 742 y el inciso (f) de la Sec. 743, *supra*, fueron añadidos a la citada Ley Núm. 319 mediante la Ley Núm. 12, *supra*. No podemos interpretar que la frase "autoridades competentes" de la Sec. 732(k), *supra*, se refiere exclusivamente al Secretario de Justicia porque sería introducir una contradicción que no existe en la citada Ley Núm. 12, la cual tuvo el propósito de "proveer los mecanismos necesarios que permitan un mejor funcionamiento" del Colegio. Exposición de Motivos de la Ley Núm. 12, *supra*.

Si la enmienda de 1980 facultó al Colegio para acudir a los tribunales, "algo que no se provee en la ley actual" según el historial legislativo, no es plausible interpretar que la misma ley de 1980 obligue al Colegio a renunciar a la facultad otorgada en la Sec. 732(k), *supra*, en favor del Secretario de Justicia.

Habiendo determinado que la ley habilitadora del Colegio, Ley Núm. 319, *supra*, le da facultad para acudir ante los tribunales en aquellas situaciones que exista evidencia de práctica ilegal de la ingeniería o agrimensura por parte de personas no colegiadas, pasemos a considerar si en el presente caso existe la evidencia requerida por la Sec. 732 (k) de la Ley Núm. 319, *supra*, al Colegio para promover la presente demanda de sentencia declaratoria.

La queja investigada por el Colegio se refiere a una situación que puede resultar en la práctica ilegal de la ingeniería, conforme a la Sec. 732(k). La queja fue, primero, a los efectos de que Metcalf, una corporación privada y quien es persona no colegiada, pactó un contrato de servicios profesionales en el cual se reservaba funciones que estaban incluidas dentro de la definición legal de práctica de la ingeniería (*e.g.* revisar el trabajo de diseño e ingeniería en progreso, interpretar planos de construcción y especificaciones). En segundo lugar, se señaló que Metcalf estaba utilizando la palabra "ingeniero" en conjunción con su nombre corporativo en documentos tales como contratos y correspondencia; que Metcalf hizo representaciones como ingeniero y así se le había descrito en la prensa puertorriqueña.

Al acudir ante el tribunal competente, el Colegio presentó la evidencia recopilada con respecto a la queja de posible práctica ilegal. Esta evidencia consistía en copia de los dos (2) contratos suscritos entre Metcalf y la Autoridad: el Contrato original y el Convenio Suplementario. Más adelante, también presentó copia de documentos en los

cuales Metcalf utilizaba la palabra "ingeniero" inmediatamente después de su nombre corporativo.([21])

El texto de la Sec. 732(k), *supra,* no especifica el tipo de evidencia que se ha de presentar ante el tribunal. Sólo dispone "y de existir evidencia a tales efectos [sobre práctica ilegal de la profesión]". Por tratarse de un caso civil, la decisión del juzgador será tomada de acuerdo con la preponderancia de las pruebas a base de criterios de probabilidad.([22])

Son admisibles en evidencia los tres (3) contratos que presentaron las partes ante el tribunal: el Contrato original entre la Autoridad y Metcalf, el Convenio Suplementario que enmendó el Contrato y el Acuerdo firmado entre Metcalf y Gayá. Ambas partes los reconocieron en sus escritos como auténticos.([23])

También son admisibles las copias de la correspondencia de Metcalf sometida por el Colegio, así como las tarjetas de presentación de los oficiales de Metcalf. Metcalf admitió su autenticidad, en lugar de atacarla, cuando ofreció su explicación sobre dichas copias en su alegato ante este Tribunal.([24])

---

([21]) Las copias de documentos fueron presentadas por el Colegio como *exhibits* para acompañar la Moción en Oposición a Sentencia Sumaria.

([22]) Regla 10(F) de Evidencia, 32 L.P.R.A. Ap. IV.

([23]) La Regla 76(G) de Evidencia, 32 L.P.R.A. Ap. IV, dispone:

*"Autenticación mediante admisión*: Un escrito u otro material puede ser autenticado mediante evidencia de que la parte contra quien se ofrece admitió su autenticidad en cualquier momento, o mediante evidencia de que ha sido aceptado como auténtico por la parte contra la cual se ofrece." (Énfasis suplido.)

Véase, también, la Regla 75 de Evidencia:

"El requisito de autenticación o identificación como una condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que el proponente sostiene." 32 L.P.R.A. Ap. IV.

([24]) La correspondencia de Metcalf también es admisible como excepción a la regla de prueba de referencia bajo la Regla 65(F) de Evidencia, 32 L.P.R.A. Ap. IV, que se refiere a récord del negocio.

En vista de lo anterior podemos concluir que el Colegio tenía la evidencia que le exige la citada Ley Núm. 319, en su Sec. 732(k), *supra*, para creer que había una situación que podía resultar en práctica ilegal de la ingeniería y, en virtud de la capacidad provista por su ley habilitadora, está facultado para instar en los tribunales la presente demanda de sentencia declaratoria en contra de la Autoridad y Metcalf.([25]) No se cometió el error señalado.

## III

*Discusión de los errores señalados*

La peticionaria Metcalf alegó ante nos que el tribunal de instancia cometió cuatro (4) errores, el primero de los cuales gira en torno a la legitimación activa del Colegio para demandar en los tribunales a personas no colegiadas que practiquen la ingeniería. Establecida ya la capacidad del Colegio para entablar la presente acción declaratoria,

---

([25]) El mecanismo procesal en solicitud de sentencia declaratoria utilizado por el Colegio es adecuado para dirimir la controversia entre las partes. El objetivo de la Regla 59 de Procedimiento Civil "es proveer al ciudadano un mecanismo procesal de carácter remedial o profiláctico mediante el cual anticiparse a dilucidar ante los tribunales los méritos de cualquier reclamación que en forma latente entrañe un peligro potencial en su contra". *Charana v. Pueblo*, 109 D.P.R. 641, 653 (1980). En *Moscoso v. Rivera*, 76 D.P.R. 481, 488 (1954), expresamos con respecto a la ley en que se fundamentó la actual Regla 59, y citando a Bochard: " 'La seguridad y la certidumbre en las relaciones jurídicas es una cuestión de tanto interés público como de interés privado . ...' "

Conforme a la Regla 59.2, el Colegio, en virtud de su ley habilitadora que le encomienda "proteger a sus miembros en el ejercicio de la profesión", 20 L.P.R.A. sec. 732(i), es persona interesada en un contrato cuyas cláusulas pueden interpretarse como reservando funciones de ingeniero a una corporación como Metcalf que es una persona no colegiada. La Regla 59.2 aclara que "[u]n contrato podrá ser interpretado antes o después de haber sido infringido". J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña*, San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 137.

El Colegio está facultado por ley para demandar y reclamar los derechos de sus colegiados de manera análoga a las asociaciones, que pueden representar y reclamar los derechos de sus socios, a diferencia que éstas últimas pueden demandar bajo la doctrina de legitimación en causa. Véase *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989).

pasemos a discutir los restantes tres (3) señalamientos de error.([26])

## A. *Nulidad de las cláusulas*

ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL NO DESESTIMAR LA DEMANDA INSTADA CUANDO ES EVIDENTE QUE NO PROCEDE LA SOLICITUD DEL DEMANDANTE DE QUE SE DECLAREN NULAS LAS CLÁUSULAS DEL CONTRATO ENTRE LA AUTORIDAD Y M&E PUES NO HAY VIOLACIÓN A LA LEY NÚM. 399.

En Puerto Rico los contratantes pueden establecer los pactos, cláusulas y condiciones que estimen convenientes con la limitación de que no sean contrarios a las leyes, a la moral, ni al orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. No puede contratarse en contravención a las leyes del país. *Berrocales v. Tribunal Superior*, 102 D.P.R. 224, 227 (1974). Todos los servicios profesionales que no sean contrarios a las leyes o a las buenas costumbres pueden ser objeto de contrato. Art. 1223 del Código Civil, 31 L.P.R.A. sec. 3421.

En el ejercicio de su poder regulador (*police power*), el Estado tiene facultad para regular y controlar la práctica de las profesiones a fin de proteger la salud y el bienestar público, a la vez que evita el fraude y la incompetencia. También puede prohibir la práctica de una profesión, a menos que primero se obtenga una licencia, permiso o certificado de alguna entidad u oficial examinador. Véanse: 6A *Corbin on Contracts* Sec. 1513

---

([26]) Los cuatro (4) errores planteados por Metcalf quedan subsumidos dentro del señalamiento de error de la Autoridad:

"Si el Honorable Tribunal de Instancia erró en no declarar CON LUGAR la Moción de Sentencia Sumaria de la Peticionaria, a los efectos de que basado en los hechos materiales incontrovertidos del caso, según las alegaciones y los contratos suscritos entre las partes sometidos en el récord, la corporación codemandada Metcalf & Eddy no se obligó con la peticionaria a prestar servicios profesionales de ingeniería o arquitectura en violación de la Ley Núm. 399 del 10 de mayo de 1951, 20 [L.P.R.A.], [S]ec. 681 *et seq.*"

(1982); *Pérez v. Junta Dental*, 116 D.P.R. 218, 233 (1985); *Infante v. Junta de Médicos Exam. de P.R.*, 43 D.P.R. 325, 330 (1932).

La obtención de licencia de ingeniero en Puerto Rico está restringida a las personas naturales. En *Rasa Eng. Corp. v. Daubón*, 86 D.P.R. 193 (1962), los codemandados Daubón y Franceschini contrataron los servicios de la corporación Rasa para que ésta preparase un proyecto preliminar de construcción y la confección de los planos para dicho proyecto. Aunque Rasa cumplió con sus obligaciones contractuales hasta la fecha en que Daubón le informó que descontinuase el trabajo, no se le compensó por los servicios prestados. Rasa presentó demanda en cobro de honorarios profesionales, la cual fue desestimada en instancia por entenderse "que, siendo ilegal el ejercicio de la ingeniería o la arquitectura por parte de la corporación recurrente, también lo es el contrato en que ésta basó su reclamación, no estando los recurridos impedidos por excepción de oponer a la reclamación dicha ilegalidad, por ser el contrato contrario a la política pública". *Rasa Eng. Corp. v. Daubón*, supra, pág. 195. Conforme a la ley que creó la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores, Ley Núm. 399 de 10 de mayo de 1951, *supra*, (vigente en aquel entonces), era ilegal para cualquier persona practicar u ofrecer practicar la ingeniería a menos que la persona estuviera matriculada como tal de acuerdo con dicha ley. Interpretamos que la palabra "persona" para los efectos de la ley

> ... sólo puede referirse a individuos, pues sus requisitos de preparación académica y examen ante la Junta, y registro, certificación y colegiación sólo pueden cumplirse por personas naturales. *Rasa Eng. Corp. v. Daubón*, supra, pág. 196.

Fundamentándonos en las disposiciones estatutarias citadas, en *Rasa Eng. Corp. v. Daubón*, supra, estable-

cimos, primero, que las corporaciones no pueden ejercer las profesiones de ingeniería, arquitectura y agrimensura en Puerto Rico y, segundo, que es un acto ilegal que constituye delito menos grave el ejercicio de las profesiones por parte de tal persona no matriculada conforme a la ley, que no haya obtenido la certificación correspondiente y que no sea miembro del Colegio de Ingenieros y Agrimensores o del Colegio de Arquitectos. Íd., págs. 196–197.

En aquel caso, la corporación demandante, Rasa, estaba constituida por dos (2) accionistas, ingenieros debidamente matriculados y colegiados quienes personalmente rindieron los servicios de ingeniería a través de la corporación. Permitimos al demandante enmendar su demanda para que alegase si verdaderamente estos accionistas eran la parte interesada con derecho a recobrar por servicios profesionales debidamente prestados.

La controversia que nos ocupa requiere que examinemos la evidencia sometida por las partes, unos contratos pactados entre una corporación pública y una corporación privada autorizada a ejercer en Puerto Rico, para así poder determinar si algunas de sus cláusulas son nulas. La demanda del Colegio, en solicitud de que se dicte sentencia declaratoria en contra de la Autoridad y de Metcalf, está fundamentada, primordialmente, en el texto de dichos contratos y en las leyes que regulan la práctica de la ingeniería en Puerto Rico. Tanto la parte peticionaria como la recurrida han comparecido para someter sus respectivos alegatos. Teniendo ante nos la evidencia documental sometida por las partes al Tribunal Superior, estamos en igual posición que el foro de instancia para interpretar los contratos conforme al estado de Derecho vigente. Veamos.

Primeramente, debemos analizar las cláusulas del contrato original impugnadas por el Colegio a fin de determinar si las cláusulas son válidas. En caso de responder en la negativa, tendremos que decidir si el Convenio Suplementario entre las partes fue suficiente para enmendar el Con-

trato original entre Metcalf y la Autoridad, y curar su defecto.

▮ En su Art. 4, el Código Civil dispone que "[s]on nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos en que la misma ley ordene su validez". 31 L.P.R.A. sec. 4. Véase, también, *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 685 (1987), y casos allí citados.

Del texto del Contrato de servicios profesionales, cuyas cláusulas en controversia citamos en la relación de hechos, se desprende con meridiana claridad que se le reservaba a Metcalf la facultad de preparar especificaciones de diseño, construcción y ejecución (Parte II.c.1), interpretar planos de construcción y especificaciones (Parte II.a.2), revisar y evaluar el trabajo de diseño e ingeniería en progreso (Parte II.e.3), revisar y aprobar dibujos de taller (Parte II.e.3), y supervisar los trabajos de construcción para asegurar su ejecución conforme a los planos y las especificaciones (Parte II.e.3).

▮ Todos los deberes y funciones mencionados en las cláusulas impugnadas comprenden la práctica de la ingeniería tal y como lo define la ley. Véanse: 20 L.P.R.A. ant. sec. 682(e); 20 L.P.R.A. sec. 711b. Debido a que Metcalf es una corporación, está prohibida de ejercer la ingeniería en Puerto Rico. *Rasa Eng. Corp. v. Daubón*, supra. Resolvemos que las cláusulas impugnadas por el Colegio son nulas por cuanto son relativas a la práctica de la ingeniería por parte de una corporación, lo cual es contrario a la ley, a la moral y el orden público. 31 L.P.R.A. sec. 3372; *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991).

Ahora bien, habiendo determinado que las cláusulas son nulas, pasemos a considerar si dicho obstáculo quedó salvado mediante la enmienda efectuada al Contrato denominada *Supplemental Agreement* o Convenio Suplementario. El propósito de la enmienda fue aclarar las dudas que habían surgido en cuanto a que Metcalf había pactado ofrecer

servicios como ingeniero en contravención a la entonces vigente Ley Núm. 399, *supra*.

En la medida en que cualquiera de los servicios descritos en el párrafo II, titulado "Alcance de los servicios", pudiese involucrar la práctica de la ingeniería o de la arquitectura según definida en el Artículo 1(e)(1)(2) de la Ley Núm. 399 de 10 de mayo de 1951, según enmendada, 20 L.P.R.A. sec. 682, M&E empleará y/o contratará los servicios de ingenieros licenciados debidamente calificados y/o sociedades civiles profesionales organizadas o compuestas por ingenieros y/o arquitectos debidamente calificados y licenciados, conforme a las disposiciones de la referida Ley Núm. 399. (Traducción nuestra.) Convenio Suplementario, pág. 1.

A raíz de esta enmienda, Metcalf contrató a la sociedad de ingenieros Gayá. La enmienda, sin embargo, no salva la nulidad de las cláusulas impugnadas por el Colegio. Un breve párrafo para declarar que la corporación contratará ingenieros para todas aquellas funciones y deberes que conlleven la práctica de la ingeniería en el contrato no es suficiente para eliminar del texto todas las cláusulas en las que se le designan a Metcalf funciones y deberes de ingeniero sin estar autorizada para ejercer en Puerto Rico. Esas cláusulas están fatalmente viciadas por lo que había que hacer constar que se eliminaban y que la Autoridad se ocuparía de realizar un segundo contrato directamente con uno o más ingenieros o ingenieras. Como bien señala el Colegio, no puede subcontratar Metcalf lo que nunca tuvo efecto jurídico.

Los peticionarios se equivocan cuando alegan que las formalidades de los contratos no son elemento determinante de la ilegalidad de la práctica de la ingeniería. Para efectos del estatuto, no es necesario ejercer la ingeniería ilegalmente. Basta con que una persona no colegiada *ofrezca ejercer* la profesión de ingeniero, tal y como ofreció Metcalf en el contrato. Véanse: 20 L.P.R.A. ant. sec. 681; 20 L.P.R.A. sec. 711x.

Tampoco nos convencen los argumentos de Metcalf

cuando solicita que juzguemos la forma de operar utilizada por ella en lugar de la forma corporativa utilizada en el contrato. Es de notar que transcurrieron más de tres (3) meses (desde el 20 de marzo hasta el 28 de junio) antes de que las codemandadas accedieran a "aclarar" el Contrato Original, y antes de que Metcalf contratara a Gayá, todo a raíz de las críticas que hiciera el Colegio públicamente. No podemos, pues, prestar atención a su forma de operar debido a que ese período de tres (3) meses quedó al descubierto.

■ Aún más, el Colegio presentó prueba documental, no contradicha por los peticionarios, en cuanto a la identidad de los socios de la sociedad de ingeniería Gayá. Estos son los ingenieros John Dedyo, Raúl Gayá Benejam y Raúl Gayá Nigaglioni. Tanto el señor Dedyo como el señor Gayá son empleados en el más alto nivel de la referida corporación. John Dedyo es Presidente de "Metcalf & Eddy of New York, Inc." y de "Metcalf & Eddy de Puerto Rico". De igual manera, es Vice Presidente Regional de la matriz Metcalf & Eddy, Inc. Por su parte, Raúl Gayá es el Director de Operaciones de Metcalf & Eddy, Inc. de Puerto Rico. Si bien la referida sociedad puede ser perfectamente legal, levanta sospechas de ser un subterfugio utilizado por la corporación para evadir la prohibición vigente en Puerto Rico a la práctica corporativa de la ingeniería.

El tribunal de instancia no cometió el error señalado por los peticionarios.

B. *Gerencia de construcción*

Erró el Honorable Tribunal de Instancia al no desestimar la demanda cuando la determinación solicitada por el demandante al efecto de que la gerencia de construcción constituye práctica de ingeniería, es en este caso académico y constituiría emitir una opinión consultiva.

En su demanda, el Colegio solicita al tribunal de instancia, primero, que éste determine que la gerencia de cons-

trucción constituye práctica de la ingeniería. Si el tribunal así lo concluye, el Colegio pide, en segundo lugar, que se declaren nulas e ineficaces todas aquellas cláusulas que conceden a Metcalf funciones de gerencia de construcción y diseño. Como fundamento a su pedido, sometió una Resolución de la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores, la cual tiene fecha de 18 de diciembre de 1973.

La referida resolución está fundamentada en un estudio efectuado por el entonces Colegio de Ingenieros, Arquitectos y Agrimensores de Puerto Rico.([27]) El estudio fue sometido a la Junta Examinadora para que ésta lo revisara y tomara la acción pertinente. La Junta Examinadora emitió, entonces, la Resolución sobre Gerencia de Construcción.

Según la mencionada resolución, el objetivo del concepto de "Gerencia de Construcción" tiene dos (2) fases: la de diseño de la obra y la del proyecto de construcción.

> El concepto y Sistema de Gerencia de Construcción tiene como objetivo el proveer servicios profesionales de consultoría en la etapa de diseño de la obra para asegurar que su costo no sobrepase limitaciones pre-establecidas; y que en el proyecto se utilicen materiales y artefactos que provean una construcción de calidad al más bajo costo posible; que el proyecto se mantenga dentro de un itinerario, tanto en su fase de diseño así como de construcción, que permita su ocupación o uso en un tiempo razonable.([28])

A pesar de que el término *construction management* o "gerencia de construcción" se utiliza con frecuencia en la industria de la construcción, no existe una definición uniforme para toda la industria.([29])

---

([27]) Recuérdese que no fue sino hasta 1978 que los arquitectos formaron su propio colegio aparte.

([28]) Véase Resolución de la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores de 18 de diciembre de 1973, págs. 1–2.

([29]) "While some contractors claim the assumption of financial risk, or the fulfillment or general conditions, are the keys to a definition of CM, others say all their

Así, por ejemplo, se ha definido que el gerente de construcción:

· is the qualified general contracting organization which performs Construction Management under a professional services contract with the owner. As the construction professional on the construction team, the CM [Construction Manager] works with the owner and the [architect/engineer] from the beginning of design through completion of construction, providing leadership to the construction team on all matters relating to construction keeping the construction team informed, and making recommendations on construction technology and construction economies. *The CM proposes construction alternatives* to be studied by the construction team during the planning phase, and accurately *predicts the effects of these alternatives* on the project cost and schedule. Once the project budget and schedule have been established, he *monitors* subsequent development of the proyect to ensure that those targets are not exceeded without the knowledge and concurrence of the owner. The CM *manages procurement of material* and supplies, *coordinates work* of all trade contractors, *assures conformance to design requirements*, provides current cost and progress information as work proceeds, and performs other construction-related services as required by the owner. (Énfasis suplido.) W. Sneed III, *Avoiding Liability in Architecture*, pág. 136. Citado en Partridge & Noletto, Construction Management: Evolving Roles and Exposure of Construction Managers and Architects/Engineers, 12 Am. J. Trial Advoc. 55 (1988).

Hay quien afirma que el gerente de construcción debe estar capacitado para ayudar en el proceso de la construcción mediante el ofrecimiento de sugerencias para modificar el diseño de la obra, proveer consultoría de tipo financiero y proveer la habilidad analítica necesaria para resolver problemas ocasionados por circunstancias imposibles de predecir y las exigencias que surgen en cualquier proyecto de construcción. J. Gorman, *Simplified Guide to Construction Management for Architects and Engineers*, pág. xv (1976). Citado en Partridge & Noletto, *supra*.

---

design-only and design-and-construct projects are CM contracts ... [;] the time is overdue for an agreement on basic definitions." S. Goldhaber et al., *Construction Management: Principles and Practices*, pág. 294 (1977). Citado en Partridge & Noletto, *infra*.

La falta de una definición uniforme de lo que significa Gerencia de Construcción ha dificultado la labor de los tribunales en aquellos casos en los que hay que decidir las responsabilidades y funciones del gerente de construcción. Véanse, por ejemplo: *Gibson v. Heiman*, 547 S.W. 2d 111 (1977), y *Attlin Const. v. Muncie Community Schools*, 413 N.E. 2d 281 (Ind. Ct. App. 1980).

De acuerdo con los autores Partridge & Noletto, hay cuatro (4) grupos potenciales que rivalizan por la posición de gerente de construcción. Estos son los dueños de la obra, los contratistas generales, los profesionales del diseño (*e.g.*, ingenieros, arquitectos) y los consultores. Conforme al criterio de ambos autores, "ninguno de los cuatro grupos por sí solo funciona idealmente. Sin embargo, hay maneras mediante las cuales estos grupos pueden adquirir el peritaje necesario. Por ejemplo, se puede establecer una empresa conjunta con el propósito de crear un equipo que tenga a su disposición las fortalezas de cada uno de los cuatro grupos". (Traducción nuestra.) Partridge & Noletto, *supra*.

Habiendo visto que los ingenieros y arquitectos forman sólo uno de los cuatro (4) grupos que pugnan por la posición de gerente de construcción en Estados Unidos, pasemos a analizar la situación en Puerto Rico. En nuestra jurisdicción existen dos (2) documentos oficiales aparentemente contradictorios en cuanto a la Gerencia de Construcción: la antes mencionada Resolución de 18 de diciembre de 1973 expedida por la Junta de Ingenieros, Arquitectos y Agrimensores, y la Opinión del Secretario de Justicia Núm. 5 de 8 de febrero de 1974. Nótese que para aquel entonces estaba vigente la Ley Núm. 399 de 10 de mayo de 1951, *supra*, y que los arquitectos todavía no se habían separado del Colegio.

En la resolución, la Junta Examinadora llegó a tres (3) determinaciones. Primero, resolvió declarar que el Sistema de Gerencia de Construcción

> ... constituye una práctica de las profesiones de ingeniería o arquitectura y para poder implementar el mismo, en esta jurisdicción, se requiere un fiel cumplimiento con las disposiciones de la citada Ley # 399. Resolución de la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores, de 18 de diciembre de 1973, pág. 7.

También resolvió enviar copia de la resolución a las agencias gubernamentales y a otras entidades que usaran el Sistema de Gerencia de Construcción "para su conocimiento y acción correspondiente". En tercer lugar, le solicitó al Colegio "que notifique a todos sus miembros de esta determinación para evitar que incurran en violaciones de ley".

Por su parte, la Opinión del Secretario de Justicia de 1974 fue en contestación a una solicitud de asesoramiento por parte de la Autoridad de Edificios Públicos (A.E.P.) en torno a la legalidad de la Gerencia de Construcción. Debido a que la A.E.P. llevaría a cabo un programa acelerado de construcción a un costo cercano a los cuatrocientos (400) millones de dólares, decidió

> ... reorganizar su procedimiento de construcción de obras bajo el método de "Gerencia de Construcción". El propósito de este mecanismo es ayudar a resolver el problema de costos y del tiempo excesivo que toman los proyectos desde su planificación hasta su ocupación. En otras palabras, este mecanismo constituye primariamente un instrumento de control de costos y de mayor efectividad en presupuesto de tiempo y dinero. Op. del Sec. Just. Núm. 1974-5, pág. 17.

Luego de un análisis de la ley que crea la A.E.P., de los poderes que ésta le confiere y de su historial legislativo, la Opinión pasa a considerar la Ley Núm. 399, *supra,* que regulaba en aquel momento la práctica de la ingeniería. Acto seguido cita las disposiciones del contrato que iba a ser utilizado por la A.E.P. (*Standard Form of Agreement for Project Management Services*) en el cual claramente se "establece la obligación del Gerente de Construcción respecto a la organización, coordinación y supervisión de la obra en

construcción". (Traducción nuestra.) Op. Sec. Just. Núm. 1974–5. Aún más, añade que el contrato de Gerencia de Construcción no era el único que otorgaría la A.E.P. para el desarrollo de la obra, sino que ésta otorgaría un *contrato adicional* para servicios de arquitectura e ingeniería. En cuatro (4) de los artículos del contrato se distinguía claramente las gestiones del gerente de construcción de aquellas gestiones relacionadas con la práctica de la ingeniería y la arquitectura. Así, por ejemplo, en el contrato se disponía que los ingenieros/arquitectos retendrían la autoridad final en materias relativas a los documentos de diseño del proyecto, específicamente:

> ... all interpretation of the plans and specifications, development and approval of any revisions in the plans and specifications; approval of anny revisions in the plans and specifications; approval of shop drawings, samples, etc.; final design decisions utilizing PM [Project Management Team] technical recommendations; development of design solutions for conformance with all codes and public safety requirements and other design-related decision-making shall remain within the authority of the A/E [Architect/Engineer]. Op. Sec. Just. Núm. 1974–5, pág. 21.

Finalmente, la opinión aclara que las obligaciones del gerente de construcción son una extensión de las propias gestiones que la A.E.P. realiza a nombre y para el Gobierno de Puerto Rico. Aunque dicha instrumentalidad administre el desarrollo de obras públicas, esto "no exime a la Autoridad de Edificios Públicos de utilizar profesionales licenciados en los aspectos técnicos que a éstos les compete". Op. Sec. Just. Núm. 1974-22. En resumen, afirma el Secretario de Justicia,

> ... no hay requisito legal alguno que requiera que el Gerente de Construcción sea de una profesión particular siempre que se garantice que las gestiones particulares que bajo el Gerente se realicen estén en manos de los profesionales competentes, según la ley disponga. Op. Sec. Just. Núm. 1974-5, págs. 22–23.

Luego de haber discutido ambos documentos con res-

pecto a la Gerencia de Construcción, la Resolución de la Junta Examinadora y la Opinión del Secretario de Justicia, estamos en posición de analizar el señalamiento de error. El peticionario Metcalf nos advierte que el Tribunal no debe embarcarse en la tarea de determinar que la Gerencia de Construcción es una práctica de la ingeniería porque ello equivaldría a emitir una opinión consultiva. Como fundamento, alega que la determinación ya se ha convertido en académica pues toda la labor de ingeniería que requiera el contrato entre la Autoridad y Metcalf será realizada por Gayá, quienes son los ingenieros contratados por Metcalf con esos propósitos. No podemos estar de acuerdo. En el presente caso existe una controversia viva y real entre las partes, puesto que en su demanda el Colegio cuestiona la mera inclusión en el contrato entre la Autoridad y Metcalf de las cláusulas que conceden a Metcalf funciones de gerente de construcción. No se trata de una cuestión hipotética o abstracta. Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., Vol. I, 1986, pág. 116. Por el contrario, de lo que se trata aquí es que si la Gerencia de Construcción constituyese práctica de la ingeniería, entonces las cláusulas que le confieren a Metcalf funciones de gerente de construcción son nulas por contravenir la ley, conforme a *Rasa Eng. Corp. v. Daubón*, supra, puesto que Metcalf no está autorizada a ejercer las profesiones en Puerto Rico.

Consideremos, antes que todo, las posiciones de las partes con respecto a la Resolución de la Junta Examinadora y a la Opinión del Secretario de Justicia. El Colegio propone que la Junta Examinadora, como organismo administrativo del Estado Libre Asociado, es la entidad con el *expertise* administrativo para opinar sobre la interpretación de la ley que administra y que, en todo caso, la interpretación última de la ley radica en los tribunales.

Por su parte, Metcalf se apoya en la Opinión del Secre-

tario de Justicia. Según su interpretación de la Opinión Núm. 5, *supra*, alega que la Gerencia de Construcción no constituye práctica de la ingeniería en Puerto Rico; aún más, afirma que tanto la Junta Examinadora como el Colegio han de atenerse a dicha opinión. La alegación de Metcalf denota la falta de una lectura detenida de la opinión. El Secretario de Justicia fue específico al aclarar que sólo emitía juicio con respecto a la A.E.P.:

> No estamos emitiendo juicio sobre la validez del mecanismo de "Gerente de Construcción" entre partes privadas y *sí sólo en relación a la Autoridad de Edificios Públicos.* (Énfasis suplido.) Op. Sec. Just. Núm. 1974-5, 2, pág. 18.

Es por ello que, aunque las Opiniones del Secretario de Justicia son obligatorias para las agencias administrativas que solicitan el asesoramiento, la citada Opinión Núm. 5 citada del Secretario de Justicia no constituye un obstáculo a lo declarado en la Resolución de la Junta Examinadora.

Sin embargo, por no ser necesario, no determinaremos si la Gerencia de Construcción constituye práctica de la ingeniería como solicita en su demanda el Colegio.[30]

---

[30] Cabe señalar que el legislador nada ha dispuesto sobre este particular. Según hemos apuntado, existen cuatro (4) grupos que pretenden laborar como gerentes de construcción (véase Partridge & Noletto, *supra*); por lo tanto, cualquier restricción a la práctica de la Gerencia de Construcción podría afectarlos sin haberles dado una oportunidad de exponer sus posiciones sobre el asunto. También es importante tomar en consideración que en los currículos de estudio en Escuelas de Ingeniería reconocidas, tales como la del Recinto de Mayagüez de la Universidad de Puerto Rico, la Gerencia de Construcción no es un curso que forme parte de los cursos requisitos para graduación comunes a todas las ingenierías. Si la Gerencia de Construcción no es una materia necesaria para obtener el título de ingeniero, ni se requiere entrenamiento en ella para obtener la licencia o colegiarse, éstos resultan puntos importantes a considerar en cuanto a una determinación de si la Gerencia de Construcción constituye o no una práctica de la ingeniería. Recordemos que la definición consagrada en la Ley Núm. 399, *supra*, la cual sigue vigente en la Ley Núm. 173, *supra*, con muy pocos cambios, es que la práctica de la ingeniería o arquitectura significa "[l]a prestación de cualquier servicio profesional o la ejecución de cualquier trabajo de naturaleza creadora para cuya realización se requieran los *conocimientos, adiestramientos y experiencias de un ingeniero o* arquitecto". (Énfasis suplido.) 20 L.P.R.A. sec. 682(e)(1); 20 L.P.R.A. ant. sec. 711 (b)(a). Al analizar el problema también hay que tomar en cuenta el hecho de que cuando se emitió la Resolución de la Junta

No obstante, aunque nos abstengamos en este momento de determinar si la Gerencia de Construcción constituye o no una práctica de la ingeniería, hay que reconocer que ciertas áreas de la Gerencia de Construcción inciden en la práctica de la ingeniería. Aunque no exista estatuto alguno que requiera que el gerente de construcción sea de una profesión determinada, resolvemos que las gestiones particulares que comprendan cualesquiera aspectos técnicos de la ingeniería que se realicen bajo la supervisión del Gerente de Construcción, éste vendrá obligado a utilizar profesionales debidamente autorizados y colegiados.[31] El error señalado no se cometió.

### C. *Uso del Título de ingeniero por parte de no colegiados*

Erró el Honorable Tribunal de Instancia al no desestimar la demanda ya que no es meritoria la alegación del demandante al efecto de que M&E (Metcalf) ha violado la Ley Núm. 399 al utilizar el vocablo de ingeniero luego de su nombre corporativo.

En su alegato ante nos, Metcalf afirma que el hecho de que indique en sus documentos, y luego de su nombre, que es una firma de ingenieros, por sí sólo no puede violar la Ley Núm. 399, *supra.*

Originalmente, el Colegio había solicitado en su demanda que se determinase que constituía práctica ilegal de la ingeniería tanto el uso por parte de Metcalf del título de ingeniero en conjunto con su nombre corporativo así como también sus representaciones como ingeniero ante la prensa y el público puertorriqueño. A esa contención se opuso Metcalf en su Moción de Sentencia Sumaria y alegó que:

El hecho de que M&E en sus documentos, provenientes de sus oficinas en los Estados Unidos luego de su nombre, indique

---

Examinadora todavía el Colegio de Ingenieros y Agrimensores, y el Colegio de Arquitectos no se habían separado.

[31] Ello no es óbice a que, de ser uso y costumbre en la Isla que el gerente de construcción sea un ingeniero o un arquitecto, se continúe con dicho uso y costumbre.

que es una firma de ingenieros, por sí no puede violar la Ley Núm. 399. Moción de Sentencia Sumaria sometida por Metcalf al Tribunal Superior, pág. 10.

El Colegio acompañó su Moción en Oposición de Sentencia Sumaria con dos (2) *exhibit*. El *Exhibit* A es una copia de las tarjetas de presentación de John Dedyo, las cuales se refieren a su posición como Presidente de "Metcalf & Eddy of New York, Inc." y como Vice-Presidente Regional de "Metcalf & Eddy, Inc.". Ambas tarjetas identifican a Metcalf como "Engineers and Planners". Para refutar la alegación de Metcalf en el sentido de que se trataba de documentos provenientes de las oficinas de la corporación matriz en Estados Unidos, el Colegio presentó el *Exhibit* B, que es una copia de una carta con el siguiente membrete impreso:

Metcalf & Eddy de Puerto Rico
Engineers & Planners
Edificio Eastern, Avenida de Diego
Santurce, Puerto Rico
Telephone 809–728–8585
Mailing Address: P.O. Box 238
Avenida de Diego 106
Santurce, PR 00907

Esta carta está firmada por Vernon D. Thompson, Director de Programa. La carta va dirigida a cualificar manufactureros de equipo, tarea relacionada al proyecto que Metcalf llevaba a cabo para la Autoridad.

Metcalf admite que los *exhibit* presentados por el Colegio son copias de sus documentos y no refuta su autenticidad. En su lugar, alega que son irrelevantes al asunto que nos ocupa. Diferimos.

De modo muy patente y claro, al igual que la nueva Ley Núm, 173, *supra,* lo hace en la actualidad, la Ley Núm. 399, *supra,* disponía:

A los fines de proteger la vida, la salud, y la propiedad, y para fomentar el bienestar público, se dispone por este Capítulo que

toda persona que en público o privadamente ejerza u ofrezca la profesión de ingeniero, arquitecto o agrimensor en Puerto Rico vendrá obligada a presentar evidencia de que tiene la preparación requerida para ello, se halla inscrita en un registro oficial, ha recibido la correspondiente autorización según se dispone más adelante, y es miembro de los Colegios de Ingenieros y Agrimensores y de Arquitectos de Puerto Rico y que *será ilegal* para cualquier persona el practicar u ofrecer practicar en Puerto Rico la ingeniería, arquitectura o agrimensura, o *usar, en relación con su nombre, o de alguna otra manera asumir, usar o anunciar, cualquier título o descripción que pueda producir la impresión de que es un ingeniero, arquitecto o agrimensor autorizado*, a menos que esté matriculado como tal de acuerdo con las disposiciones de las secs. 681 a 710 de este título, que la correspondiente certificación se le haya expedido, y que sea miembro de dichos Colegios de Ingenieros y Agrimensores y de Arquitectos de Puerto Rico. (Énfasis suplido.) 20 L.P.R.A. ant. sec. 681. Véanse las disposiciones vigentes en 20 L.P.R.A. secs. 711 y 711x.

■ La ley no solamente prohíbe ejercer u ofrecer ejercer las profesiones de ingeniero, arquitecto o agrimensor a quienes no estén debidamente colegiados, sino que declara ilegal *usar* o *anunciar* cualquier título en relación con su nombre que pueda dar la impresión de que una persona no colegiada está autorizada para practicar las referidas profesiones.

■ El membrete de la carta arriba mencionada no se refiere a una corporación de ingenieros que no es de esta jurisdicción, como lo sería la corporación matriz Metcalf & Eddy, Inc., que ha enviado desde Estados Unidos su correspondencia a nuestra jurisdicción en papeles con el encabezamiento que generalmente utiliza. Tampoco se trata de una carta enviada por una de sus subsidiarias en los estados de la Unión que permiten el ejercicio corporativo de la ingeniería, como lo sería "Metcalf & Eddy of New York, Inc.". La carta firmada por Vernon D. Thompson no constituye correspondencia interna de la Oficina de Puerto Rico con destino a la oficina matriz, a sus subsidiarias o a otras empresas en Estados Unidos. *Si esas fueran las situacio-*

*nes, no habría violación al estatuto.* La ley que reglamenta el ejercicio de la ingeniería y que prohíbe la práctica de las profesiones por parte de las corporaciones en Puerto Rico no tiene efecto extraterritorial. Art. 23 del Código Civil, 31 L.P.R.A. sec. 23.

En este caso, por el contrario, el título Ingenieros y Planificadores (*Engineers and Planners*) se usa en relación con el nombre de una entidad denominada "Metcalf & Eddy de Puerto Rico", la cual tiene permiso para realizar negocios aquí, pero no está autorizada a practicar la ingeniería en la Isla. Esa conducta es la que precisamente declara ilegal la Ley Núm. 399, *supra*: usar el título de ingeniero en relación con el nombre sin estar matriculado, ni certificado ni colegiado como tal. Siendo Metcalf una corporación debidamente autorizada a realizar negocios en Puerto Rico, se le imputa el conocimiento de la ley como a cualquier otra persona natural o jurídica. Art. 2 del Código Civil, 31 L.P.R.A. sec. 2. Metcalf & Eddy de Puerto Rico no puede usar el título "Ingenieros" en correspondencia dirigida a destinatarios dentro de la jurisdicción de Puerto Rico, aún cuando no esté ofreciendo servicios profesionales de ingeniería.

No nos convencen los argumentos de Metcalf cuando afirma que no se violan las disposiciones de la ley en este caso porque en la antes mencionada carta Metcalf no está ofreciendo sus servicios profesionales como ingeniero en Puerto Rico. La ley no hace una distinción semejante. Para efectos del estatuto, basta con usar cualquier título o descripción en relación con el nombre que pueda producir la impresión de que es un ingeniero.

Por otra parte, la peticionaria Metcalf apunta que, al momento de redactarse la carta en cuestión, los servicios de ingeniería para las plantas de tratamiento de la Autoridad habían sido asignados a Gayá. Con mayor razón Metcalf debió abstenerse de utilizar el título de ingeniero con posterioridad al contrato con Gayá. De la prueba documen-

tal ante nos se desprende que la firma del Convenio Suplementario para "aclarar" el contrato original entre la Autoridad y Metcalf fue el 27 de junio, que Metcalf contrató con Gayá el 1ro de julio y que la carta de Metcalf en que usa el título de ingeniero en su membrete tiene fecha de 15 de julio del mismo año. Si ya Metcalf estaba consciente del malestar ocasionado por sus representaciones como ingeniero en el Contrato debido a que el Colegio había hecho sus críticas públicamente, al punto que tuvo que firmar una enmienda con la Autoridad y un Acuerdo con Gayá, debió haber tenido el cuidado de eliminar inmediatamente el título de *Engineers* del encabezamiento de toda su correspondencia o documentación que salía de sus oficinas en Santurce con destino a cualquier punto de Puerto Rico. El uso del título de ingeniero quince (15) días después del contrato con Gayá constituye una actuación ilegal y contraria a la Ley Núm. 319, *supra*. 20 L.P.R.A. sec. 742.

■■■ Si bien es cierto que el Colegio no está facultado para imputar el delito menos grave de práctica ilegal de la ingeniería o la agrimensura, ya que su deber es referir estos casos al Secretario de Justicia, bien puede acudir a los tribunales en una acción civil de sentencia declaratoria como ésta para que el juez determine que una persona no autorizada a ejercer las profesiones está utilizando el título de ingeniero o agrimensor, sin tener derecho a ello, y emita un remedio para prohibir civilmente que la persona continúe con dicha conducta ilegal.[32]

■■■■ En resumen, Metcalf, a través de la entidad Metcalf & Eddy de Puerto Rico, violó las disposiciones de la Ley Núm. 399, *supra*, al usar el título de ingeniero en su

---

[32] Hacemos la salvedad que hace la propia ley en el sentido de que no se utilice "cualquier título, palabra o vocablo o descripción que pueda producir la impresión de que es un ingeniero, arquitecto o agrimensor autorizado", es decir registrado, licenciado o certificado, y colegiado, conforme a las secs. 711a, incisos (i) y (j), y 711x de la ley vigente, Ley Núm. 173 de 12 de agosto de 1988 (equivalentes a las derogadas secs. 681 y 682 de la Ley Núm. 399, *supra*).

membrete de la oficina de Puerto Rico sin estar autorizada ni colegiada para ejercer la ingeniería en Puerto Rico, actuación que tuvo lugar con posterioridad al contrato entre Metcalf y la firma de ingenieros Gayá.([33]) No se cometió el error señalado por los peticionarios.

*Conclusión*

A tenor con lo dispuesto en la Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, cualesquiera partes en un pleito podrá solicitar que se dicte sentencia sumaria a su favor. La moción para que se dicte sentencia sumaria deberá ir acompañada de documentos que avalen los hechos que sustentan la posición de la parte que la solicita. El tribunal, al entender en la moción, no dirime credibilidad: presume ciertos los hechos no controvertidos. Se dictará sentencia sumaria solamente si de los documentos sometidos con la moción y la oposición a ésta y los que obran en autos "no hay controversia real en cuanto a ningún hecho material y que como cuestión de derecho procede dictarse la [misma]". Regla 36.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Véanse: *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867 (1992); *Roig Com. Bank v. Rosario Cirino*, 126 D.P.R. 613 (1990); *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83, 86 (1987); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986).

El tribunal analizará los hechos de la forma más favorable a la parte que se opone y dictará sentencia, según proceda en derecho, "a favor o en contra de cualquier

---

([33]) El delito de práctica ilegal de la ingeniería, 20 L.P.R.A. sec. 742, al igual que todos los delitos de naturaleza menos grave, prescribe al año de haberse cometido. Art. 78(b) del Código Penal, 33 L.P.R.A. sec. 3412(b). Las corporaciones autorizadas para actuar en Puerto Rico son personas jurídicas que se consideran penalmente responsables cuando cometen delitos, Art. 37 del Código Penal, 33 L.P.R.A. sec. 3174, por lo cual están sujetas a penas tales como multa, suspensión y cancelación del Certificado de Incorporación, Arts. 50–55 del Código Penal, 33 L.P.R.A. secs. 3241–3246.

parte en el pleito". Regla 36.3 de Procedimiento Civil, *supra.* "El hecho de que una parte presente una moción de sentencia sumaria no es garantía de que, una vez se determine que ésta procede, necesariamente hay que resolverla en favor de quien la presentó." *Consejo Tit. C. Parkside v. MGIC Fin. Corp.*, 128 D.P.R. 538, 549 (1991).

■ En el caso de autos, los peticionarios Autoridad y Metcalf solicitaron que se dictase sentencia sumaria para desestimar la demanda presentada por el Colegio. El Colegio se opuso a la solicitud y trajo varios *exhibit* para fundamentar su oposición. La disputa entre las partes se fundamenta en la evidencia documental que obra en autos y la interpretación de varias disposiciones estatutarias; estamos, pues, en igual posición que el foro de instancia para resolver la controversia.

De un examen detenido del voluminoso expediente de los recursos consolidados, surge con meridiana claridad que, al aplicar las normas de derecho anteriormente esbozadas, procede que se dicte sentencia sumaria a favor del Colegio de Ingenieros y Agrimensores de Puerto Rico, declarando con lugar la demanda de sentencia declaratoria solamente en cuanto a que se determina, primero, que son nulas e ineficaces las cláusulas del contrato entre la Autoridad y Metcalf que se refieren a la práctica de la ingeniería por parte de Metcalf y, segundo, que Metcalf violó la Ley Núm. 399, *supra*, al utilizar el vocablo "ingeniero" luego del nombre de la entidad corporativa autorizada a realizar negocios en Puerto Rico.

Por todo lo antes expuesto, *procede que se dicte sentencia revocando la Resolución de 7 de enero de 1987, emitida por el Tribunal Superior, Sala de San Juan, en la cual se desestiman las mociones de sentencia sumaria presentadas por la Autoridad de Acueductos y Alcantarillados de Puerto Rico y Metcalf & Eddy, Inc., y se dicte sentencia declaratoria a favor del Colegio de Ingenieros y Agrimensores de Puerto Rico, declarando con lugar la demanda de sentencia declaratoria solamente en cuanto a que se determina, pri-*

*mero, que son nulas e ineficaces las cláusulas del contrato entre la Autoridad y Metcalf que se refieren a la práctica de la ingeniería por parte de Metcalf y, segundo, que Metcalf violó la Ley Núm. 399 al utilizar el vocablo "ingeniero" luego del nombre de la entidad corporativa autorizada a realizar negocios en Puerto Rico.*

Los Jueces Asociados Señores Negrón García y Hernández Denton se inhibieron. El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita.